NORTHERN PAC. RY. CO. et al. v. BOYD.

(Circuit Court of Appeals, Ninth Circuit. March 9, 1910.)

No. 1,729.

1. RAILROADS (§ 134*)—CONVERSION BY LESSEE OF ASSETS OF LESSOR—LIABILITY TO CREDITORS OF LESSOR.

The president of a railroad company, who controlled a majority of its stock, contracted to lease its property to another company for 999 years, to sell to the lessee its supplies and material on hand, and to deliver to it 51 per cent. of the stock of the lessor. By the agreement the lessor company was to make an issue of mortgage bonds, a portion of which were to be retained by the trustee to take up a prior issue. The agreement was carried out, and the remaining bonds so issued by the lessor, which constituted the greater part, were delivered to the president of the lessor, and, as appeared from the evidence, were retained by him and his associates in payment for the stock they transferred to the lessee, which was valuable. *Held*, that such appropriation of the bonds of the lessor which would otherwise have been available for the payment of its debts was a

---

fraudulent diversion of its property as against its creditors and rendered the lessee which received the benefit of such diversion liable for a debt of the lessor which was less than the value of the property converted, from which it was not relieved by the fact that it afterward expended a larger sum in betterments and extensions of the leased road.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 134.*]

2. RAILROADS (§ 30*)—REORGANIZATION—PARTICIPATION OF STOCKHOLDERS—LIABILITY OF NEW COMPANY FOR DEBTS OF OLD COMPANY.

A reorganization of an insolvent railroad company, by which both its mortgage bondholders and its stockholders, in exchange for their bonds and stocks, are given an interest in the new company, which purchases the property of the old company at a foreclosure sale made pursuant to such plan of reorganization and by consent of the old company and its stockholders, is fraudulent in law as to unsecured creditors of the old company whose claims are left unpaid, and renders the new company liable for the claims of such creditors, who are not, under such circumstances, represented in the foreclosure suit by the mortgagor nor precluded by the decree therein from showing in equity the fraud and collusion by which it was obtained, and the property of their debtor placed beyond their reach by legal process.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 30.*]

3. EQUITY (§ 339*)—ANSWER UNDER OATH—EFFECT AS EVIDENCE.

While a sworn answer in equity, where oath is not waived, becomes evidence of the facts well pleaded therein, allegations which are not of the facts themselves, but rather of the construction placed on such facts by the pleader, do not preclude the court from resorting to such facts and placing its own construction thereon.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 339.*]

4. JUDGMENT (§ 515*)—COLLATERAL ATTACK—GROUNDS—FRAUD AND COLLUSION.

A judgment which has been procured by the fraudulent contrivance of the debtor or the collusion of both parties is subject to collateral attack by any one a stranger to the judgment who has been injuriously affected thereby.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 957; Dec. Dig. § 515.*]

5. LIS PENDENS (§ 26*)—PURCHASE OF PROPERTY—RIGHT OF CREDITORS TO IMPEACH JUDGMENT FOR FRAUD OR COLLUSION.

The fact that a creditor of a mortgagor acquired his rights pending a suit to foreclose the mortgage does not preclude him from attacking the validity of the decree in such suit in equity on the ground that it was fraudulent and collusive.

[Ed. Note.—For other cases, see Lis Pendens, Dec. Dig. § 26.*]

6. JUDGMENT (§ 678*)—PERSONS CONCLUDED—PRIVITY—SEVERAL CREDITORS OF DEFENDANT.

There is in general no such privity between several creditors of the same debtor that proceedings taken by one against the fund, the estate, or specific property to which all must look for satisfaction, will raise an estoppel against the others.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1197; Dec. Dig. § 678.*]

7. EQUITY (§ 67*)—LACHES—NATURE AND ELEMENTS.

The doctrine of laches rests upon equitable principles which are neither arbitrary nor technical, and what amounts to laches depends largely upon the circumstances of each particular case; the ultimate inquiry be-

ing as to on which side would fall the balance of justice in sustaining or denying the defense.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 191–196; Dec Dig. § 67.*]

8. Equity (§ 80*)—Laches—Estoppel to Invoke Defense.

Where the party interposing a defense of laches has caused or contributed to the delay, he cannot take advantage of it.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 237; Dec. Dig. § 80.*]

9. Equity (§ 82*)—Laches—Facts Considered.

Where the claim upon which the judgment of a complainant in a creditors' suit is based was in almost continuous litigation for many years in various suits and proceedings, during most of which time it was being contested by defendant or its predecessor in interest with which it is in privity, the complainant *held* not chargeable with laches which would defeat the suit because of the delay which did not in any manner prejudice the defendant.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 236; Dec. Dig. § 82.*]

Appeal from the Circuit Court of the United States for the Eastern Division of the Eastern District of Washington.

Suit in equity by Joseph H. Boyd against the Northern Pacific Railway Company and the Northern Pacific Railroad Company. Decree for complainant (170 Fed. 779), and defendants appeal. Affirmed.

The Cœur d'Alene Railway & Navigation Company was organized under the laws of the territory of Montana in July, 1886, with authority to build and operate railroads in the territories of Montana and Idaho. Before the end of that year it became indebted to William N. Spalding in the sum of $23,675.85 for work done and materials furnished in the construction of its narrow gauge railroad in the territory of Idaho, and on March 27, 1887, Spalding began an action in a court of Idaho against the company to recover that amount. On April 25, 1896, he obtained judgment for $36,584.95. On an appeal to the Supreme Court of the state of Idaho, the judgment was affirmed on November 26, 1897. 5 Idaho, 528, 51 Pac. 408. In December, 1898, the appellee herein, Joseph H. Boyd, brought an action against Spalding in a state court of Idaho alleging that he (Boyd) was the rightful owner of the judgment. The cause was removed by Spalding to the United States Circuit Court for the Northern District of Idaho. On May 21, 1901, the appellee obtained a decree in that court adjudging that he was the rightful owner of the judgment. In September, 1903, to prevent the expiration of the judgment obtained on April 25, 1896, and subsequently affirmed, the appellee caused summons to be issued in an action brought against the Cœur d'Alene Company to revive the same. The Cœur d'Alene Company caused the action to be removed to the United States Circuit Court for the District of Idaho. On October 23, 1905, judgment was rendered in favor of the appellee for $71,278.20, the amount of the original indebtedness with accumulated interest and costs. A writ of error was sued out to review that judgment in the Circuit Court of Appeals for this circuit. It was afterwards dismissed by stipulation. The present suit was brought on September 20, 1906, by the appellee against the appellants to recover judgment against the Northern Pacific Railroad Company for $71,278.20 and to have the judgment declared a lien on the property of the Northern Pacific Railway Company. For convenience, the corporations will be designated as they are in the briefs of counsel. The Cœur d'Alene Railway & Navigation Company will be called the "Cœur d'Alene Company," the Northern Pacific Railroad Company, the "railroad company," and the Northern Pacific Railway Company, the "railway company." By the decree of the court below it was adjudged that the railroad company was indebted to the appellee in the amount sued for, with interest and costs, that the in-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

debtedness was a lien upon the property of the railway company, and that, on the failure of that company to pay it within 30 days, the appellee might apply to the court for the appointment of a receiver. From that decree the present appeal is taken.

In March, 1887, when Spalding began his action against the Cœur d'Alene Company, that company's property consisted of a narrow gauge railway 33 miles long, together with a steamboat line in the then territory of Idaho. A mortgage, called in the record herein the "first mortgage," had, in the year 1886, been placed upon the property to secure bonds to the amount of $360,000, which had been issued and sold to the public. D. C. Corbin, the president of the Cœur d'Alene Company, owned or controlled the majority of its capital stock of $500,000. On August 1, 1888, Corbin entered into a contract with the railroad company, by the terms of which the property of the Cœur d'Alene Company was to be leased to the railroad company for a period of 999 years. The railroad company was to pay as rental, under the lease, the interest on bonds to be issued by the Cœur d'Alene Company, to the amount of $25,000 per mile of the road as it was then constructed, and as it was thereafter to be constructed, making a total issue of $825,000 on account of the 33 miles of road then built. $360,000 of these bonds were to be retained by the trustee, to retire, at their maturity, the bonds of that amount already outstanding under the first mortgage. The railroad company was to pay the Cœur d'Alene Company $20,500 on account of expenses incurred in making surveys, etc., and was to purchase from the Cœur d'Alene Company all construction and operating materials and supplies on hand at the cash value thereof. Corbin agreed to cause to be transferred to the railroad company at least 51 per cent. of the capital stock of the Cœur d'Alene Company, "full paid and nonassessable." The railroad company was to further covenant in the lease to provide a sinking fund for the redemption of the whole of the new issue of the bonds at maturity; the payments into that fund to begin 10 years from the date of the lease. Pursuant to that agreement, the Cœur d'Alene Company on September 1, 1888, executed its general first mortgage to secure the issue of bonds as provided for therein. The bonds were guaranteed by the railroad company in accordance with the agreement. $360,000 of them were reserved by the trustee and $465,000 of them were delivered to the president of the Cœur d'Alene Company as provided in the mortgage.

On September 14, 1888, the Cœur d'Alene Company executed to the railroad company the lease of its property. Four days later, there were transferred to the railroad company by Corbin and other holders thereof 5,100 of the shares of the capital stock of the Cœur d'Alene Company, and on October 1, 1888, the railroad company went into possession under the lease. By the terms of the lease, the net earnings of the leased property, after the payment of operating expenses, taxes, interest, and sinking fund charges, was to be paid as part of the rental by the railroad company directly to the stockholders of the Cœur d'Alene Company. On December 17, 1889, the railroad company acquired from Corbin 4,400 additional shares of stock of the Cœur d'Alene Company, for which it paid $220,000, and a week later it acquired the remaining 500 shares from another stockholder, paying therefor $30,000. It thus became the sole stockholder of the Cœur d'Alene Company. From October 1, 1888, to August 15, 1893, the railroad company operated the Cœur d'Alene Company's property under the lease. By June 30, 1889, its net earnings were $130,269.01. The next year they were $46,000.59. The year following there was a deficit of $36,381.19. The next year the deficit was $116,704.43, and the year ending June, 1893, it was $84,049.65. During the years 1889 and 1891, the road was rebuilt upon a standard gauge, and an extension of 16½ miles in length was made by the railroad company. By the terms of the general first mortgage, the railroad company was permitted to issue bonds to the extent of $25,000 per mile for each additional mile constructed. $413,000 of the general first mortgage bonds of the Cœur d'Alene Company were accordingly issued, and were delivered by the trustee to the railroad company to pay for the new construction. For these bonds the railroad company received in cash $411,507.50. Its expense in constructing the new road was $720,572.18, and in changing the narrow gauge road already built to a standard gauge, $151,696.90, for surveys $11,768.04, and for equipment, $23,459.61,

making a total of $495,989.23 more than the sum it received from the sale of the bonds, and the total bonded indebtedness of the Cœur d'Alene Company was then $1,238,000 held by the public.

On August 15, 1893, the railroad company became insolvent, and on that date certain of its stockholders filed a creditors' bill in the Circuit Court of the United States for the Eastern District of Wisconsin, and in that suit receivers were appointed, who took possession of the railroad, its franchises, and assets, and the receivership was extended to other suits, brought in other districts, in which the company's property was situated. There were then outstanding upon the company's property six mortgages. In October, 1893, there was defr 'lt in the interest on certain of these mortgages, and thereupon the trustee, the Farmers' Loan & Trust Company, filed its bill for foreclosure thereon in the United States Circuit Court for the Eastern District of Wisconsin. The receivership was extended to the foreclosure suit, and that and the suit upon the creditors' bill were consolidated. Similar bills for foreclosure were filed by the trustee in other jurisdictions in which the property was situated, and similar orders were taken in those jurisdictions. On September 1, 1893, the receivers, under an order of court paid the semiannual interest on the bonds of the Cœur d'Alene Company. On October 10, 1893, the trustee under the first mortgage and the general first mortgage of the Cœur d'Alene Company, together with H. H. Trowbridge, as co-complainant, commenced a suit to marshal the assets of that company. On the same day receivers were appointed. On August 24, 1895, the trustee commenced a suit in the same court for the foreclosure of the general first mortgage of September 1, 1888, and on May 25, 1896, it commenced suit in the same court for the foreclosure of the first mortgage. The three suits were subsequently consolidated.

The receivers of the railroad company who took charge of its property in 1893 found that the annual fixed charges exceeded the net income of the property. A committee of the holders of the mortgage bonds, which had been formed in 1893, formulated a plan of reorganization. It was proposed to form a syndicate to furnish the cash required to carry out the plan, by the sale of stock in a new company. The syndicate agreed to furnish the amount of money required for the purpose of carrying out the plan, in consideration of the issuance to them of 187,678 shares of the preferred stock, and 775,000 shares of the common stock, and certain mortgage bonds of the new company. It was the expectation that the stock in the new company would be taken by the stockholders of the railroad company. The plan for the reorganization received the assent of the holders of nearly all the general second, general third, and the consolidated mortgage bonds, of more than 75 per cent. of the preferred stock, and a large majority of the common stock of the railroad company. Holders of preferred stock were required to pay $10 on each share deposited by them, for which they were to receive, upon the completion of the organization, $50 in preferred stock trust certificates, and $50 in common stock trust certificates of the new company. The holders of common stock were required to pay $15 upon each share upon which they were to receive $100 of common stock trust certificates of the new company.

The Superior & St. Croix Railroad Company, a corporation of Wisconsin, was acquired, and the name of the corporation was changed to the "Northern Pacific Railway Company," and its capital stock was increased to $155,000,-000. This company was the new company contemplated in the plan of reorganization. In April, 1896, the consolidated cause for the administration of the assets of the railroad company and the foreclosure of its mortgages came on to be heard in the Circuit Court of the United States for the Eastern District of Wisconsin, upon bill and answer, and decrees were entered that the railroad lands and properties subject to the lien thereof be sold. Similar decrees were rendered in other courts, in which ancillary bills had been filed. Under these decrees the railroad lands and property of the railroad company covered by the mortgages were sold, by a special master, to the railway company. On July 27, 1896, the sale of the railroad property was confirmed, and on August 8, 1896, the sale of the lands was confirmed. By the terms of the agreement of July 13, 1896, the railway company became entitled to be invested with stock, bonds, and other property representing the system of the

railroad company, so far as the same should have been acquired by the reorganization managers, and with any balance of cash received by the reorganization managers for the purpose of carrying out the plans and agreement, which stock, bonds, and other property were to be transferred to the railway company as consideration for the issuance to the reorganization managers of all the shares of the capital stock of the railway company, and of mortgage bonds of the railway company as provided in the contract. The lands of the railroad company in Wisconsin, and North Dakota east of the Missouri river, were not covered by the mortgages which were foreclosed.

On May 25, 1896, the Farmers' Loan & Trust Company filed a supplemental bill in the United States Circuit Court for the Eastern District of Wisconsin, alleging that claims in the sum of several million dollars had been filed against the railroad company, and that judgments for more than $3,000,000 were outstanding against it unpaid, and prayed that the said lands and other unmortgaged assets of the railroad company be sequestrated and sold to pay the creditors. A decree was rendered on this bill, and the unmortgaged assets were sold at public sale by the special master to the railway company. Notice had been published in the leading newspapers of the various states through which the railroad extended, including the states of Idaho and Washington, notifying creditors to file their claims. The sale was confirmed September 16, 1899. At that time the railway company had become the owner of more than $100,000,000 of the total $102,046,316.58 of claims approved and allowed by the special master in that suit. On October 27, 1899, the court ordered the payment to the railway company of $1,200,000 out of the proceeds of the unmortgaged assets on account of such claims. On October 16, 1896, a decree was rendered in the consolidated cause pending against the Cœur d'Alene Company in the United States Circuit Court for the District of Idaho, foreclosing both of the mortgages. On January 11, 1897, the property of the Cœur d'Alene Company was sold to the railway company pursuant to the decree. The railway company bid therefor the sum of $220,000. The sale was confirmed on January 23, 1897. The railway company had previously acquired 359,000 of the 360,000 first mortgage bonds, paying therefor at par in cash, and had acquired the entire issue of 878,000 of the general second mortgage bonds, paying for each $1,000 thereof $1,000 in its own fully paid and nonassessable preferred stock. The indebtedness due upon the general first mortgage bonds of the Cœur d'Alene Company, amounting to $1,082,469.84, had been presented and allowed as a claim against the railroad company in the creditors' suit above referred to. As the owner of this indebtedness, the railway company received, pursuant to the decree of October 27, 1899, in the Circuit Court for the Eastern District of Wisconsin, the sum of $108,246.98.

The appellee in the present suit sought a decree declaring his judgment to be a liability of the railroad company, and a lien upon the property of that company from the time when it acquired the property of the Cœur d'Alene Company; that the decree of foreclosure through which the railway company acquired the properties of the railroad company be declared to have been fraudulent and void as to him; that it be decreed that the dividend of $108,-246.98 paid to the railway company on the distribution of the proceeds of the unmortgaged assets of the railroad company was an unlawful and inequitable diversion of the assets of that company; and that the money so obtained be treated as a trust fund in the hands of the railway company to be charged with the payment of the appellee's judgment. And under his prayer for general relief the appellee sought to hold the railway company liable also for the further sum of $1,200,000, which it received from the unmortgaged assets. Upon the issues presented, and the evidence adduced, the trial court sustained the bill and decreed that the appellee have a lien for the satisfaction of his judgment on the property formerly belonging to the railroad company, and now vested in the railway company by virtue of the foreclosure and sale hereinabove referred to, subject to the subsisting mortgages made by the railway company thereon, and that he is also entitled to have satisfaction of his judgment from the sums received as dividends by the railway company from the unmortgaged assets of the railroad company.

Francis Lynde Stetson, Charles W. Bunn, Charles Donnelly, and Edward J. Cannon, for appellants.

George Turner and R. L. Edmiston, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The first question to be considered is whether or not the railroad company ever became liable for the payment of the Cœur d'Alene Company's debt to the appellee. The appellee presents several grounds on which it is asserted that liability exists. One of them is that the lease constituted a diversion and appropriation by the railroad company to its own use of the assets of the Cœur d'Alene Company, such as to make it liable to the creditors of the latter company to the extent of the assets so diverted and appropriated. It was on this ground that the court below held that the railroad company became chargeable with the debt. Upon a careful consideration of the question, we are not convinced that there was error in that conclusion. On August 1, 1888, an agreement was entered into between the railroad company and Daniel C. Corbin, who was then the president of the Cœur d'Alene Company, and who owned and controlled a majority of its capital stock. He signed the agreement in his individual capacity, and not as president of the company. The agreement provided that Corbin should cause a lease to be executed to the railroad company of the property and franchises of the Cœur d'Alene Company for a period of 999 years; that the rental therefor should be the payment by the railroad company of the interest on an issue of $825,000 of bonds, $360,000 of which were to be retained by the trustee to provide for the redemption of an issue of an equal amount of bonds then outstanding against the property; that, in addition thereto, the railroad company should pay to the Cœur d'Alene Company $20,500, the expenses incurred by that company in making surveys, contesting the right of way, and in work done on a line between Wallace and the summit of the Bitter Root Range, and should also purchase from the navigation company all construction and operating materials and supplies on hand, at their cash cost; and that Corbin should cause to be transferred to the railroad company at least 51 per cent. of its capital stock, "full paid and nonassessable." There was no provision whatever in the agreement as to the disposition of the remainder of the bonds.

On September 8, 1888, the board of directors of the Cœur d'Alene Company had a meeting, at which a resolution was adopted in which it was recited that, whereas, the issue of stock and bonds of the company had been found insufficient properly to construct, complete, and equip the line of its railroad and its boats and vessels, there should be issued a series of general first mortgage bonds of the company to the amount of $825,000, of which $360,000 were to be used to retire the bonds already outstanding, and the remainder "for the purpose of making good the deficiency above set forth," and that a mortgage should be executed to secure said bonds. On September 14, 1888, the lease was executed. It recites that the board of directors of the Cœur

d'Alene Company, for the purpose of repaying money owing by it, and used in the construction of its railroad, has authorized the issuance of bonds, $360,000 thereof to be retained by the trustees to retire the outstanding bonds of that amount, $465,000 thereof having been first certified by the trustee, to be, with the coupons thereto belonging, by it redelivered to the company. The lease provides that the annual rental received shall consist of the entire net earnings of the property after paying all expenses of operating the same, and carrying on the business thereof, including all taxes and assessments, payments on incumbrances, interest and sinking fund, all mortgage bonds, and the expenses of repairing and replacing the railroad and premises. It also provides that the lessee shall pay all cost and expense of operating, maintaining, and transacting the business of the demised property, or in any manner connected with, arising out of, or appertaining to the business and the operation or management thereof, and shall indemnify the lessor from and against any and all charges, cost, expenses, suits, damages, demands, and claims of any and all kinds whatsoever, arising out of or in any manner appertaining to or connected with the maintenance, operation, or management of said demised property during the existence of the lease.

The appellant contends that the $465,000 of bonds were issued, certified, and delivered to the Cœur d'Alene Company to be used in the payment of its debts. The appellee contends that they were issued and delivered to Daniel C. Corbin for and on behalf of himself and his associates as the consideration for the 5,100 shares of stock which he delivered to the railroad company. This is a crucial question in the case, and one upon which the evidence is not altogether clear. It is shown from the books of the trustee that on October 29, $200,000 of the bonds, and on the following day $265,000 thereof, were delivered to D. C. Corbin, "president of the Cœur d'Alene Company." Corbin was called as a witness for the appellee. He was then 70 years of age, and his memory as to transactions which occurred 23 years before was uncertain. He testified, however:

"I think the agreement was that the Northern Pacific undertook to pay, if there was any indebtedness. We certainly did not. I made the sale, and it was, so to speak, I turned over the stocks to the Northern Pacific Railway Company, and got the price that was to be paid for it. After that I had nothing to do with it. I immediately left the company, and I do not remember that I had anything to do with it except when I was in New York." (This must have been at the time when he received the bonds.)

He further testified, in answer to the question whether he or his associates received any benefit from the general first mortgage:

"No. I should think not. I presume it was used, probably to pay us, I presume. I know we got our money."

Again he testified:

"I do not think we received any bonds unless possibly we might have received bonds with an agreement for somebody to take them off our hands and pay us the money, because I never had any bonds. * * * If they ever came into my hands, they just passed through my hands. I never had any, I am quite sure of that."

M. P. Martin, formerly assistant general auditor of the railroad company, in answer to the question, "Where did these $465,000 bonds go; who got them?" said:

"I suppose the promoters of that enterprise did. Q. That is, Mr. Corbin and his associates? A. Yes, sir. His rights and so on were worth something. Q. He did get that when he sold out as part of the consideration for the sale of the road? A. He and his associates certainly ought to get it. There were some other things. He had some surveys, I believe, that the Northern Pacific (paid) for, and also some stock of material that the Northern Pacific paid for."

The testimony so far, it is to be admitted, leaves it uncertain whether the bonds were turned over to the company to be used in payment of its debts, or were delivered to Corbin and his associates in payment for their 5,100 shares of stock. But it seems clear that, unless the railroad company paid for the stock in the manner so indicated, it never paid for it at all. Counsel for the appellant contends that the consideration for the stock was the guaranty of the railroad company to pay the bonds and the interest thereon. But this does not impress us as an adequate explanation of the transaction. In the agreement between Corbin and the railroad company, it was stipulated that the payment of the interest and principal of the bonds by the railroad company was to be the rental for the use of the demised property, and there is nothing in the testimony or in any of the instruments to show that the railroad company's guaranty was to be the consideration for anything other than for the use of the property. At the time when the lease was made, the Cœur d'Alene Company owned and was in possession of a property, the value of which evidently largely exceeded the company's indebtedness. Before and at that time the property was producing net earnings of 8 per centum upon $1,000,000 of capital stock. During the first 21 months of the term of the lease, the net earnings were $176,000. The cost of the property is not definitely shown, but it would seem from the testimony of Corbin that it was something above the amount realized on the first mortgage bonds of $360,000. Corbin was unable to state whether the total cost was less or more than $400,000, and we may assume that it was approximately that sum. The 5,100 shares of stock transferred to the railroad company were valuable, therefore, and it is not conceivable that the owners thereof would have parted with them without receiving in return a substantial equivalent. That the stock was valuable is further shown by the fact that the railroad company, after it had acquired the majority thereof, purchased the remainder at a cost of $250,000. After the lease the Cœur d'Alene Company possessed nothing subject to execution, save its interest in the rental reserved. By April 3, 1889, all of the directors and officers of the Cœur d'Alene Company had resigned, and their places had been filled by officers and employés of the railroad company. The president of the railroad company became the president of the Cœur d'Alene Company. On May 29, 1889, the directors of the Cœur d'Alene Company declared a dividend of 6 per cent. to its stockholders. More than one-half of this was payable to the railroad company as the principal stockholder. From and after that date, although for a few months there were net earnings of the leased

property, there is no evidence that any dividend was ever declared, or that any meeting of the directors of the Cœur d'Alene Company was ever held. It would seem that there was no occasion for further meetings, for the whole of that company's possessions and the majority of its stock had been transferred, and the remainder of its stock was soon thereafter transferred to the railroad company.

It is a significant fact that, about a month after the lease was made, the railroad company, which then had the control of the Cœur d'Alene Company, permitted Corbin to receive the bonds, and that, so far as the evidence shows, neither the Cœur d'Alene Company nor the railroad company ever took any interest in or supervised or even considered the question of the disposition thereof. If, as contended by the appellant, those bonds were to be used in paying the debts of the Cœur d'Alene Company, it behooved the railroad company to see that they were so used, in order that such debts might not thereafter be enforced against the rental which the railroad company had covenanted to pay, rental that was nominally to be paid to the Cœur d'Alene Company, but of which in reality more than one-half was then payable, and eventually all was to be paid to the railroad company as the sole stockholder. Although there were special meetings of the directors of the Cœur d'Alene Company after the execution of the lease, in none of them was any mention made of the $465,000 in bonds which were delivered to Corbin. It seems clear that no portion of those bonds was in fact used to pay debts of the Cœur d'Alene Company. All these considerations tend to the conclusion that the understanding was that the bonds were to be delivered to Corbin in consideration of the transfer of the property and of the control of the stock, and for the individual use of Corbin and his associates, and not for the benefit of the Cœur d'Alene Company.

In brief, viewing the whole transaction, and looking through the form to the substance thereof, we are of the opinion that the evidence sustains the conclusion that the mortgage, although it was authorized and executed by the Cœur d'Alene Company, was procured by the railroad company, with the intention to use a portion of the proceeds thereof to buy the stock of the mortgaging company. In other words, by agreement with, and with the consent of Corbin and his associates, the railroad company used a portion of the assets of the Cœur d'Alene Company for its own purposes, and the Cœur d'Alene Company never received the same or the benefit thereof. The fact that Corbin and his associates participated in the transaction and in the diversion of the assets of their company does not relieve the railroad company, which was the beneficiary, and which in this indirect way obtained the proceeds of a portion of the bonds, from its liability to answer as for a diversion of the assets. To this state of facts, the doctrine of the decision in Chicago, etc., Railway Co. v. Chicago Bank, 134 U. S. 276, 10 Sup. Ct. 550, 33 L. Ed. 900, is applicable. In that case the court said:

"The properties of a corporation constitute a trust fund for the payment of its debts; and, where there is a misappropriation of the funds of a corporation, equity, on behalf of the creditors of such corporation, will follow the funds so diverted. The Milwaukee Company from securities on the property

of the Pacific Company received nearly $3,000,000. Part it used for the benefit of the lessor company, and part it appropriated to its own benefit. Can it do this and let the lessor company's debt go unpaid? Equity answers this question in the negative."

Nor is the appellant relieved from the application of that doctrine by the fact that, after taking possession under the lease, the railroad company spent for betterments and extension of the Cœur d'Alene Railroad a sum of money in excess of the amount of the bonds so diverted. Answering a similar proposition in the case above cited, the court said:

"The misappropriation gave to the bank at the time at which it was made the right to pursue the misappropriated proceeds into the hands of the Milwaukee Company. That right the Milwaukee Company could not thereafter defeat by spending money on the property of the Pacific Company; and it was unnecessary to enter into any inquiry as to the reasons for this subsequent expenditure, or as to how far the necessities of its own business on the through line from Chicago to Omaha compelled further improvements on that portion of the line east of the Mississippi river."

Having reached the conclusion that the sum due the appellee became a debt of the railroad company, the question arises whether the railway company has succeeded to the obligation to pay it. One of the grounds on which it is asserted that the obligation rests is that the foreclosure proceedings by and through which the railway company acquired the property of the railroad company were in equity fraudulent as to the appellee because consummated pursuant to a previous collusive agreement between the bondholders and the stockholders of the railroad company, whereby the latter were permitted to retain an interest in the property acquired by the railway company on the foreclosure. In Louisville Trust Co. v. Louisville, etc., Ry., 174 U. S. 674, 19 Sup. Ct. 827, 43 L. Ed. 1130, the court said:

"Assuming that foreclosure proceedings may be carried on, to some extent at least, in the interests and for the benefit of both mortgagee and mortgagor (that is, bondholder and stockholder), we observe that no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests not merely of the mortgagee, but of every creditor of the corporation. In other words, if the bondholder wishes to foreclose and exclude inferior lienholders or general unsecured creditors and stockholders, he may do so; but a foreclosure which attempts to preserve any interest or right in the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors; first of secured, and then of unsecured, creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation."

Does the evidence show that the foreclosure proceedings were had under an understanding or agreement, whereby there was to be and was recognized and preserved any interest in the stockholders of the railroad company in the property? There is no question but that the foreclosure decree was entered upon the consent of all the parties to the suit. The suit had been commenced on October 18, 1893. It had rested upon the demurrer of the railroad company since April 2, 1894. On April 27, 1896, the date of the decree, the railroad company filed

its answer admitting the allegations of the bill of complaint and setting forth the facts necessary to permit a decree without reference to a master. The interveners allied with the railroad company did the same thing, and on the same date. Up to that time there had been resistance to the foreclosure on the part of the railroad company. In 1893, after the railroad company had gone into the hands of receivers, and a new board of directors had been elected, the company filed a petition for the removal of the receivers, alleging that it was through the mismanagement of the former executive officers of the railroad company, who subsequently had been appointed receivers, that the company had become involved in financial difficulties. In January, 1894, the directors issued to the stockholders a printed circular reiterating such charges of mismanagement, calling upon the stockholders to protect their interests, advising them that, if properly protected, they "can secure equitable terms in any reorganization," and stating that the directors "propose to secure justice for the stock," by bringing suits for the recovery of large sums of money improperly spent, and diverted, and suggesting that stockholders contribute $12.50 per hundred shares to support the measures thus indicated. The general and harmonious assent to the foreclosure decree was the result of the reorganization scheme promulgated March 16, 1896, whereby the railroad was to be bought at foreclosure by a new company, which was to retire the old bonds with new ones and retire the stock of the railroad company by issuing in exchange therefor shares in the new company. As consideration for shares of the new company, holders of preferred stock of the old company were to pay $10 per share for new preferred and common stock, and holders of the common stock were required to pay $15 per share for common stock in the new company, and stockholders were allowed stock in the new company upon these terms, only on condition that they surrendered their stock in the old. The reorganization scheme was an agreement made by the reorganization committee as party of the first part; the Mercantile Trust Company, party of the second part; J. P. Morgan & Co., party of the third part; the holders of mortgage bonds of the railroad company, holders of certificates of the Mercantile Trust Company for general second, general third, and consolidated mortgage bonds, holders of collateral trust notes and dividend certificates of the railroad company and the mortgage bonds of various branch railroads of the railroad company, and holders of the preferred and common stock of the railroad company, "who shall become parties to this agreement," parties of the fourth part; the Deutsche Bank of Berlin, as depositary, party of the fifth part; and a committee, on behalf of various interests in the railroad company, called the Protective Committee, "in evidence of their active support of the reorganization thereof, according to the plan provided herein," parties of the sixth part.

It is evident that the scheme was inspired by the desire to maintain the integrity of the railroad system. There were many difficulties in the way of accomplishing this. There were 15 subsidiary roads controlled by as many different corporations and subject to liens of different ranks, which were held by numerous bondholders. There were holders of first mortgage bonds on distinct portions of the system and

holders of general mortgage bonds upon the whole system and numerous stockholders whom it was desired to protect and whom, on account of the complication of the situation, it was decided to protect by allowing them a substantial interest in the reorganized company. Counsel for the appellant admit that only by the plan adopted or one substantially similar could the property have been placed upon a sound financial basis.

It is shown that the agreement was carried out according to its terms, that the new company was acquired and its name was changed to Northern Pacific Railway Company, that it became the purchaser of the property at the foreclosure sale, that it paid therefor the old bonds which had been vested in it under the reorganization, and issued its own stock for delivery to the stockholders who complied with the terms of the reorganization scheme. After the foreclosure decree, and in July, 1896, an agreement was made between the railway company and J. P. Morgan & Co., whereby the former was to issue and deliver to the latter $75,000,000 in preferred stock, $80,000,000 in common stock, $130,000,000 in prior lien bonds, and $60,000,000 in general lien bonds, amounting in all to $345,000,000. The agreement stipulated that the said securities were of that value, and it provided that the securities and properties theretofore or thereafter received by J. P. Morgan & Co. pursuant to the agreement should be vested in the railway company, and it declared that it was the intention of the agreement and of the parties thereto that the railway company should become and be the suitable agency contemplated in said plan and agreement for the ownership and operation of the properties acquired and to be acquired pursuant to said plan and agreement. The evidence shows that this plan also was fully carried out. In brief, the bondholders received new bonds secured by the same property and permitted their old bonds to be used for the purpose of foreclosure, and to enable the stockholders to buy the property for their own use, the same to be held by a new company, composed of the stockholders of the old.

But it is urged that the appellant's answer denies, and that the evidence fails to show any fraudulent intent on the part of those who were engaged in the reorganization scheme, and the transactions which attended and followed it, that the reorganization agreement required stockholders of the railroad company as a condition to the issuance to them of stock in the new company to pay on the exchange of preferred stock $10 per share, and on the exchange of common stock $15 per share, and that this was as much as the new stock was worth, and that the transaction was in effect a purchase of the new stock at no less than its actual value. So far as the intent is concerned, it may be conceded that there is absence of evidence of actual fraudulent intention. But where the effect of such a transaction is to exclude creditors from recourse to property which should have been subject to their claims, the law will hold it fraudulent as to them, no matter what may have been the actual purpose thereof. Nor are we convinced that the transaction whereby the new stock was issued was in effect a subscription to and a payment for new stock at its full value. It is not in evidence that any outsiders were allowed to take stock in

the new company at those figures, and it is a significant fact that preferred stockholders were given the right to exchange on the payment of the $10 per share, while the common stockholders were required to pay $15. The evidence is that the preferred shares were at all times of twice the value of the common. In the agreement of July, 1896, it was stipulated that the value of the property transferred to the new company was $311,000,000. It is not disputed that the railroad company's property had cost, up to August 31, 1896, $241,067,769.91. Its bonded indebtedness, principal and interest, was $152,334,450.50. The first trial balance of the receivers shows that the stocks and bonds and securities of other companies owned by the railroad company at the time it went into the hands of the receivers was $128,609,536.30, and that the contingent liabilities for branch roads was $45,144,000.

Again, it is to be observed that the railway company bid the property in for $12,500,000, subject to liens of mortgages superior to those on which the foreclosure was had, aggregating about the sum of $44,-000,000, and subject to receiver's certificates and costs of about $5,000,-000, making the total cost to the railway company about $61,500,000. In addition to this, it acquired the $3,500,000 cash which was turned over to it. By the cancellation of the $12,500,000 of mortgage bonds used in payment for the property at the foreclosure sale, there was left in the hands of the reorganization committee about $87,000,000 in uncanceled bonds which were afterwards turned over to the railway company. They formed the principal portion of the claim which the railway company presented against the unmortgaged assets of the railroad company. From these figures it will be seen that, if the cost of the company's property represented its full value, it had an excess of assets over liabilities of $88,733,319.41. We are of the opinion that the market price of the stock at that time, owing to the attendant conditions, should not be taken as the measure of its value. The first year after the reorganization the railway company earned a surplus of $489,828.90. Out of the earnings of the second year, dividends of $3,000,000 were paid, $811,709.35 were spent in betterments on the road, and a surplus of $2,897,847.60 was set aside. From that time the earnings of the road were greatly increased. These facts, together with the evident solicitude of the Protective Committee to protect the stock, and the fact that the stockholders deemed it to their advantage to avail themselves of the protection, lead to the conclusion that by the foreclosure, the reorganization, and the transfer of the property to the railway company, a substantial benefit was secured to the stockholders of the railroad company. In the circular of January, 1894, it was said:

"If properly protected, stockholders can secure equitable terms in any reorganization. Let the law and the terms of the bonds be what they may, the fact is that an actual foreclosure of the consolidated mortgage and the sale of the road would involve so much time and trouble as to make it practically impossible. The question as to the land grant, the claims of holders of preferred stock and others of equal importance, make it essential that the rights of the stockholders be not ignored. * * * While recognizing the superior claims of the bonds, the directors propose to secure justice for the stock."

From a consideration of the proceedings in the foreclosure suit, whereby was evidenced the general assent of all parties in interest to

177 F.—52

a decree of foreclosure, and the antecedent, concurrent, and subsequent documents and agreements, the conclusion seems inevitable that the parties to the agreement aimed to and did avoid the "actual foreclosure" which was deprecated in the circular, and that the foreclosure which was had was a foreclosure in form and not in substance, that it was but the means adopted for reorganization, to take the road and the property out of the hands of the receivers, to protect the lienholders, to relieve the property of the burden of the unsecured indebtedness, and also to protect the stockholders, and that it did in fact produce all these results.

But the appellant contends that no agreement of any kind for sale of the stock of the railway company or any part thereof to the stockholders of the railroad company was proposed or made until after the publication of the plan and until after the syndicate subscribers by their contract had become bound to purchase the stock. We think this statement is not altogether sustained by the record. It is true that the appellant so alleged the facts in its answer to the bill, and, inasmuch as by the bill an answer under oath was not waived, the answer which was made under oath became evidence of the facts well pleaded therein. But the answer as to this particular matter may be regarded, not as a statement of the facts, but as the construction which the appellant placed thereon. We are not precluded from resorting to the agreement of reorganization and other papers to determine what is their purport and effect. We find nothing therein to indicate that the syndicate subscribers ever by contract became bound to purchase the stock. In the plan of March 16, 1896, it is recited that a syndicate has been formed to provide the cash estimated to be necessary to carry out the terms of the plan of reorganization, and to furnish the new company with cash for working capital in the further sum of $5,000,-000 for the use and betterment of its property; but the instrument is silent as to the method by which such funds were to be obtained, and it clearly contemplates the issuance of new stock to the holders of the old, and by various provisions recognizes the rights of the stockholders of the old company, and makes provision for their protection.

But assuming it to be true that the syndicate subscribers did become bound to purchase the stock, that fact does not materially alter the complexion of the transaction. If they became so bound, theirs was a contingent liability only—a liability which, in view of the value of the contemplated holdings of the new company, they might safely incur. The important fact is that the syndicate did not in fact purchase the new stock, and that the right of the stockholders of the old company to acquire the same was recognized from the first. The stockholders were represented by the Protective Committee in the reorganization scheme. They came into the scheme, and they became the owners of the new stock in pursuance thereof. In brief, by the reorganization the property of the old company was transferred to the new, and the stockholders of the old company became the stockholders of the new, having at all times retained an interest as stockholders. Under this state of facts, the appellee has the right to look to the new company for the payment of his judgment. In Railroad Company v. Howard, 7 Wall. 392, it was held that a sale under foreclosure of

[1] 19 L. Ed. 117.

mortgage of an insolvent railroad company, expedited and made advantageous by an arrangement between the mortgagees and the stockholders, whereby, after payment to the mortgagees of a percentage of the debts due them, the stockholders of the company were to receive the residue of the proceeds, was fraudulent as against the general unsecured creditors, notwithstanding that the road was mortgaged far above its value and on a sale in the open market did not bring enough to pay the mortgage debts, so that in fact if there had been an ordinary foreclosure, without arrangement between the mortgagees and the stockholders, the whole proceeds of the sale would have belonged to the mortgagees. Said the court:

"Equity regards the property of a corporation as held in trust for the payment of the debts of the corporation, and recognizes the right of creditors to pursue it into whosesoever possession it may be transferred, unless it has passed into the hands of a bona fide purchaser, and the rule is well settled that stockholders are not entitled to any share of the capital stock, nor to any dividend of the profits until all the debts of the corporation are paid."

In addition to the right of recourse against the railway company on the theory that its stockholders retained an interest in the property transferred upon the reorganization, the court below sustained the right of the appellee to resort to the sums received by the railway company out of the proceeds of the unmortgaged property of the railroad company, to wit, the $1,200,000 received by the railway company on its holdings of the uncanceled bonds of the railroad company, and the dividend of $108,000 received by it on the uncanceled bonds of the Cœur d'Alene Company. The unmortgaged property of the railroad company was administered under the supplemental bill filed on May 25, 1896, by the Farmers' Loan & Trust Company, in which, as trustee, it alleged that there were certain lands of the railroad company not included in the mortgages, and that the trust company was a judgment creditor of the railroad company, and it prayed that the court administer and distribute the unmortgaged assets. The railroad company and all parties to the original bill answered the supplemental bill on the day on which it was filed, admitting the truth of all the allegations thereof. Thereupon followed an order for the sale of the unmortgaged land, a sale of the same to the railway company, a decree by consent confirming the sale, a report by the master of the allowance of claims, and an order distributing the fund in accordance therewith. The debts proven before the master aggregated $98,032,928.53, of which $197,020.42 were allowed to outside parties in small amounts, and the remainder was allowed to the railway company on the bonds held by it, and on other indebtedness which it had acquired as part of the reorganization scheme. Upon these proofs of debt it received the dividend of $1,200,000. The dividend of $108,246.98 was paid on a claim of $1,082,469.84 based on the following facts. On January 11, 1897, the property formerly belonging to the Cœur d'Alene Company was sold on foreclosure to the railway company for $220,000. The railway company at that time had acquired $359,000 of the $360,000 of the first mortgage bonds and the entire issue of $878,000 of the second mortgage bonds; the former having been paid for in cash at par, and the latter by the nonassessable preferred stock of the railway com-

pany. The difference between the total amount of the bonds so held by the railway company and the sum which it bid on the property was presented by the railway company as a claim against the railroad company. We find it unnecessary to enter into a discussion of the numerous questions involved in this branch of the controversy for the reason that in our judgment the decree of the Circuit Court is sustainable on the ground already indicated.

So far as it concerns the right of the appellee to pursue the property transferred to the new company by the reorganization, the relief which the appellee seeks may be accorded under the doctrine of the decision in Johnson v. Waters, 111 U. S. 640, 4 Sup. Ct. 619, 28 L. Ed. 547, which is thus expressed:

"In such cases the court does not act as a court of review, nor does it inquire into any irregularity or errors of proceeding in any other court; but it will scrutinize the conduct of the parties, and, if it finds that they have been guilty of fraud in obtaining a judgment or decree, it would deprive them of the benefit of it, and of any inequitable advantage which they have derived under it."

The purpose of the present suit is to deprive one of the parties to the foreclosure suit of a benefit which it derived under the decree therein. It is to require the railway company, which obtained the property as the result of the decree and the agreement and understanding of the parties whereon it was based, to devote a portion of the property so obtained to the payment of the claim of one who was equitably entitled to receive the same out of the property so transferred. It is true that a decree of foreclosure is conclusive and binding as to all questions properly in issue between the mortgagor and the mortgagee, and that a creditor of the mortgagor is in privity with him as to all such issues, so that he, as well as the mortgagor, is bound by the decree, for the reason that his claim upon the mortgagor's property is derived through the mortgagor and is subject to all previous liens or preferences or conveyances made in good faith. But where the mortgagor by agreement with the mortgagee assumes an attitude hostile to that of the creditor, whereby the creditor is deprived of his rights, the latter is no longer represented by the mortgagor, nor is he precluded thereafter from advancing the charge of fraud against one who thus inequitably obtained an advantage by the decree. Moran v. Hagerman, 12 C. C. A. 239, 64 Fed. 499.

In Black on Judgments, § 605, it is said:

"It is now well settled upon high authority that, where no fraud or collusion has been shown in the recovery of a judgment, such judgment is conclusive of the fact and the amount of indebtedness of the judgment debtor, and it cannot be collaterally impeached by third persons in a subsequent suit where such indebtedness is called in question."

In support of that proposition, the text-writer cites the leading case of Candee v. Lord, 2 N. Y. 269, 51 Am. Dec. 294, in which the court said:

"In creating debts, or establishing the relation of debtor and creditor, the debtor is accountable to no one unless he acts mala fide. A judgment, therefore, obtained against the latter without collusion, is conclusive evidence of the relation of debtor and creditor against others. * * * Where, however, fraud is established, the creditor does not claim through the debtor but

adversely to him, and by a title paramount, which overreaches and annuls the fraudulent conveyance or judgment by which the latter himself would be estopped."

The doctrine is well established that a judgment which has been procured by the fraudulent contrivance of the debtor or the collusion of both parties is subject to collateral attack by any one a stranger to the judgment who has been injuriously affected thereby. Black on Judgments, § 293; Pacific Railroad of Missouri v. Missouri Pac. Ry. Co., 111 U. S. 504, 4 Sup. Ct. 583, 28 L. Ed. 498; Michaels v. Post, 21 Wall. 398, 426, 22 L. Ed. 520; Guardian Trust Co. v. Kansas City So. R. Co., 146 Fed. 337, 76 C. C. A. 615. The appellant contends that the appellee is precluded by the decree for the reason that he acquired his rights pendente lite and is therefore bound by the decree as fully as if he had been made a party to the foreclosure suit, and it cites Stout v. Lye, 103 U. S. 66, 26 L. Ed. 428; Hollins v. Brierfield Coal & Iron Co., 150 U. S. 385, 14 Sup. Ct. 127, 37 L. Ed. 1113; Herring v. Railway Co., 105 N. Y. 340, 12 N. E. 763; and other cases. In Stout v. Lye, the bill was brought by a lien creditor, who at the time of the commencement of the foreclosure suit against the debtor was but a contract creditor. He sought to reopen the foreclosure decree and to show that the mortgage was illegal for want of power in the mortgagee to take it, and to have certain payments of usurious interest credited upon the debt. The court held that, having secured his lien pendente lite, he was not a necessary party, and that he was bound by the doctrine of lis pendens, and that as a simple contract creditor he could not question the validity of the mortgage or the amount due upon it, but was bound as to such matters as a privy of the judgment debtor. But there was in that case no allegation of mala fides in the defense which the judgment debtor made to the foreclosure suit. In brief, in none of the cases cited by the appellant is involved the effect of the want of good faith in the defense made by the judgment debtor. In Herring v. Railway Co., the court, speaking of the creditors, said:

"They were represented therein by the people through the Attorney General and by the receiver, and by the defendant the Erie Railway Company. They could undoubtedly have been permitted to intervene, or to appeal from the judgment or any of the orders, if any ground of appeal existed. But they had no right to attack the same collaterally unless for fraud sufficient, within the rules applicable to such cases, to sustain an action to set aside a fraudulent judgment."

The appellant contends that the court in which the foreclosure proceedings were had having found that there was no such participation by stockholders in the reorganization as to invalidate those proceedings, its judgment, rendered after a consideration of the specific objections here relied on, is binding upon the appellee. The judgment so referred to was rendered upon intervention proceedings brought by certain unsecured creditors of the railroad company, in the court in which the foreclosure proceedings were pending and before they had been consummated by a sale. The judgment roll is not in the record, in this case, but from the opinion of the court (Paton v. Northern Pac. [C. C.] 85 Fed. 838) it appears that the intervening complainants set forth the plan of reorganization of the railroad company, al-

leged that thereunder the stockholders were to retain an interest in the property, the retention of which was a fraud upon the general creditors, and they asked that the sale of the property be enjoined. The court, upon a consideration of these objections, held their bill to be without equity and refused to enjoin the sale. But that decision is not res judicata as to the present suit, for the appellee was not party to or represented in that suit. "There is in general no such privity between several creditors of the same debtor that proceedings taken by one against the fund, the estate or specific property to which all must look for satisfaction, will raise an estoppel against the others." 23 Cyc. 1255, and cases there cited. Nor is the decision in that case a precedent for our guidance in the present suit, for we think its doctrine runs counter to the opinion of the Supreme Court in Louisville Trust Co. v. Louisville, etc., Ry. Co., supra.

The appellant earnestly contends that upon principles as old as equity jurisprudence the delay of the appellee in commencing this suit and in prosecuting the proceedings preliminary thereto is fatal to his success herein. Much may be said both for and against the defense of laches as applicable to this case. The action which was begun by Spalding in the District Court of Idaho Territory in March, 1887, was defended by the railroad company. It was not brought to trial until the year 1890. The judge before whom the case was tried rendered an opinion in favor of Spalding, but before he could prepare findings and enter judgment he died. At this time, as the cause of further delay, there intervened the forming of the state government of Idaho, and the transfer of causes from the territorial courts to the state courts. Spalding's attorney was elected to Congress, and during much of the following two years he was out of the state. During that interval the cause was continued more than once by stipulation at the request of the railroad company's counsel. At the end of his term in Congress, Spalding's attorney was elected to the bench to preside over the court in which the action was pending. His disqualification to try the case caused still further delay. Finally, in April, 1896, the cause was tried, and Spalding obtained his judgment. The railway company by its attorneys and at its own expense appealed the cause to the Supreme Court of Idaho, where the judgment was affirmed in November, 1897. 5 Idaho, 528, 51 Pac. 408. The remittitur from that court did not reach the lower court until December, 1897. Early in 1898 Spalding caused execution to issue on the judgment, but no property could be found. On May 3, 1898, he commenced an action in the nature of supplemental proceedings and prayed for a receiver of the property of the Cœur d'Alene Company, making that company, the railroad company, and the railway company, parties defendant. The railway company removed the cause to the Circuit Court of the United States for the District of Idaho. That court remanded it to the state court. The railway company appealed the order to remand to this court, where the ruling of the Circuit Court was affirmed. 93 Fed. 286, 35 C. C. A. 295. The railway company then presented its petition for a writ of certiorari to the Supreme Court of the United States. The petition was denied May 1, 1899. 174 U. S. 801, 19 Sup. Ct. 884, 43 L. Ed. 1187. The state court of Idaho then ap-

pointed a receiver. The railway company appealed to the Supreme Court of Idaho. 6 Idaho, 638, 59 Pac. 426. That court reversed the order of the lower court and directed that the case be dismissed for want of jurisdiction.

The appellee, having ascertained that Spalding was denying his right to the judgment, commenced an action against Spalding on December 20, 1898, in the Circuit Court of the United States for the District of Idaho to establish his title to the judgment. Defense was made to the action, but on May 21, 1901, the appellee obtained his judgment affirming his title to the judgment, with the sole power to enforce it. Spalding gave notice of appeal to this court. The appeal was not dismissed until January, 1902. About this time there was correspondence between the appellee's attorneys and the railway company looking to a settlement of the judgment. In January, 1903, the appellee's attorneys advised the appellee, in view of the fact that the statute of limitations had nearly run on the judgment, that it was inadvisable to proceed further in the effort to collect the judgment until they had revived it under the laws of Idaho. Suit to revive the judgment was commenced. The railway company removed the suit to the Circuit Court of the United States, and vigorously contested the same, so that the judgment was not obtained until October 23, 1905. The railway company then appealed from the judgment of revivor to this court, and the appeal was still pending when the present suit was commenced. The review of these facts indicates that the appellee, with the exception of the interval between January, 1902, and January, 1903, had been endeavoring to establish his rights in the judgment and to compel its enforcement, and that in all such litigation except that which was directed against Spalding he had been opposed by the railway company, and that from time to time he notified that company of his rights and warned it to pay the judgment to no one but himself. He gave such notice before bringing his action against Spalding, and later, August 3, 1899, he gave notice of the pendency of his action against Spalding, and when he established his right to the judgment in that action he notified the railway company of that fact.

The doctrine of laches rests upon equitable principles which are neither arbitrary nor technical, and what amounts to laches depends largely upon the circumstances of each particular case. The ultimate inquiry is on which side would fall the balance of justice in sustaining or denying the defense. The important elements to be considered are the length of time which has elapsed, the nature of the acts which have been done in the meanwhile, the knowledge which the complainant had of the fraud which he charges, and the time when he acquired that knowledge and the change in the situation during neglectful repose either as to the loss of evidence which would have been available to the defendant or the advance in value of the property which may be the subject of the suit. Said the court, in Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738:

"Laches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting a claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties."

And in Wilson v. Wilson, 41 Or. 459, 69 Pac. 923, Judge Wolverton said:

"If  *  *  *  it clearly appears that lapse of time has not in fact changed the conditions and relative position of the parties, and that they are not materially impaired, and there are peculiar circumstances entitled to consideration as excusing the delay, the court will not deny the appropriate relief although a strict and unqualified application of the rule would seem to require it. Every case is governed chiefly by its own circumstances."

It cannot be said in this case that the appellant has been prejudiced by the delay, in that it has thereby lost the evidence or means of proving the facts and circumstances on which its defense on the merits depends; nor is the case complicated by an increase in value of the subject of the litigation. The railroad properties, it is true, have greatly advanced in value since the time of their transfer to the appellant; but the appellee is not here seeking to obtain specific property. He is seeking but the satisfaction of a judgment for money, and his right thereto is in no way affected by an increase in the value of the property which is alleged to be subject to the payment of the same.

It is impossible to escape the conviction that the delay was not prejudicial to the appellant but was to its advantage, and that it was largely caused by its own acts. As successor to the Cœur d'Alene Company, the railroad company actively opposed all efforts of Spalding to obtain a judgment and to enforce his claim, and as successor to the railroad company the appellant strenuously continued the opposition. Those companies were aware, of course, that the ultimate purpose of the litigation was to obtain satisfaction of the appellee's claim out of the property of the railroad company or of the railway company, and they knew that it was a claim for labor and materials which had not been paid for and which went into the construction of property which they acquired and owned. There was a time, it is true, between the years 1890 and 1896, when Spalding appears to have slumbered on his rights; but even in that period the delay was partly caused by the acts of the railroad company's attorneys, and it was a delay that occurred before the time when the appellant acquired the property which it now owns. Where the party interposing a defense of laches has contributed to or caused the delay, he cannot take advantage of it. 5 Pomeroy's Eq. Jur. § 35.

The appellee and his attorney both testified that until shortly before commencing this suit they had no knowledge of the facts which they now rely upon as invalidating the foreclosure decree. According to their testimony, they had knowledge only of the fact that the suit was pending at Milwaukee to foreclose the mortgages, and that a decree to foreclose was rendered and the property was acquired by the appellee; but they had no knowledge of the facts upon which they now seek relief.

In view of all the evidence and the equitable rules applicable thereto, we are not convinced that the court below erred in rejecting the defense of laches.

The decree is affirmed.