PORTO RICO MINING CO. et al. v. CONKLIN.

(Circuit Court of Appeals, Eighth Circuit. February 14, 1921. Rehearing Denied May 4, 1921.)

No. 5438.

1. **Appeal and error** ⊚⇒931(1), 1009(3)—**Findings of fact presumptively correct, and not disturbed when based on conflicting evidence.**

Where a chancellor has made his findings of fact and decree on conflicting evidence, they will be treated as presumptively correct by an appellate court, and will not be disturbed unless an obvious error has intervened in the application of the law, or some serious mistake has been made in the consideration of the evidence.

2. **Mines and minerals** ⊚⇒64—**Facts authorizing rescission of contract for purchase of mining leases.**

Evidence sustaining findings that defendants, to induce the purchase from them by complainant of mining leases, made false representations and concealed facts in respect to the character and value of the mines, and bribed the expert employed by complainant to examine and report on the property, and that complainant relied on such representations and reports, *held* sufficient to justify his rescission of the contract.

3. **Mines and minerals** ⊚⇒64—**Mere suspicion of fraud does not require immediate election to rescind purchase of mining leases.**

A purchaser of mining leases, on discovery that he has been defrauded, must rescind the contract at once, or he waives the right; but the acquiring of knowledge of facts which merely create a suspicion, and put him on inquiry, does not require an immediate election, and a delay until he can obtain substantial evidence of the fraud in the exercise of due diligence, is not a waiver.

4. **Mines and minerals** ⊚⇒64—**Right to rescission of purchase of mining leases not barred by laches or estoppel.**

Complainant contracted for the purchase of mining leases, to be paid for in installments, with provision that on default in payment of any installment his rights should be forfeited, and all payments made retained as liquidated damages. After payment of the greater part of the price, he obtained information by hearsay indicating that he had been defrauded

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in the purchase, but an attempt to verify such information was at the time unsuccessful. *Held*, that a suit for rescission of the contract, commenced four months later, during which time he was prosecuting inquiries, was not barred by laches, nor by estoppel, because of his payment of the installments which fell due in the meantime.

Stone, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Suit in equity by Roland R. Conklin against the Porto Rico Mining Company and others. Decree for complainant, and defendants appeal. Affirmed.

J. G. L. Harvey, of Kansas City, Mo. (James A. Reed, of Kansas City, Mo., on the brief), for appellants.

Leslie J. Lyons, of Kansas City, Mo. (Hiram W. Currey and Paul E. Bradley, both of Joplin, Mo., and Forrest W. Hanna, of Kansas City, Mo., on the brief), for appellee.

Before CARLAND and STONE, Circuit Judges, and ELLIOTT, District Judge.

ELLIOTT, District Judge. This was a suit instituted in the court below by appellee, Conklin, against the Porto Rico Mining Company, Barnett Mining Company, G. A. Barnett, and J. W. Ground as defendants. The record discloses, however, that the defendant Ground is not a party to this appeal; he having settled with the appellee for his liability upon the judgment rendered against him and the appellants.

The record and briefs in this appeal are largely devoted to a discussion of the settlement made by Ground with the appellee, the terms and the legal effect of such settlement, as to the liability of these appellants for the payment of the balance unpaid on such judgment. Especial exception is taken both in the record and briefs on this appeal to an order of the trial court denying the petition of the appellant Barnett to enjoin appellee from taking proceedings to satisfy the judgment in question. Soon after the argument of this case in this court an appeal was perfected by Barnett from the order made by the trial court denying his petition, which prayed that appellee be enjoined from taking any proceedings to satisfy the judgment of appellee against Ground and these appellants, thereby eliminating the questions therein involved from consideration upon this appeal. Barnett v. Conklin, 268 Fed. 177.

Appellee was plaintiff below, appellants were defendants, and for convenience will be referred to herein as such. The plaintiff, Conklin, had purchased from the defendants a mining property, located in the Joplin district, for the sum of $175,000, and a suit in the trial court was instituted for the purpose of rescinding the contract of purchase and the recovery of the money paid to the defendants, on the ground of misrepresentation and fraud. A decree of rescission was entered, as prayed, and money judgment rendered in the sum of $167,225.88; the defendants having been given credit, on account of property which the plaintiff was unable to restore, in the sum of $5,455.63.

A brief statement of the allegations of the plaintiff in his bill is as follows:

After alleging citizenship and description of the property, and the fact that it was leased and subleased, and that plaintiff entered into a contract with defendants for the purchase of the mining properties for the price of $175,000, the contract is set forth in full in the bill, and is in substance that it was entered into the 11th day of March, 1916, between plaintiff and defendants, describing the mining claims, and also a 200-ton lead and zinc concentrating plant, together with any buildings, mining equipment, tools, and machinery on the premises; $10,000 being paid in cash; $15,000 to be paid on or before March 21, 1916; $70,000, April 20, 1916; $20,000, May 20, 1916; $20,000, June 20, 1916; $20,000, July 20, 1916; and $20,000, August 20, 1916— with interest thereon, as therein stated, at 6 per cent. Said contract contained a clause that, if plaintiff failed to make any of the deferred payments within 10 days after the same became due, then the bank where the bills of sale had been placed was thereby directed to deliver said bills of sale and assignments of the mining leases to the defendants and all payments which had been made on the purchase price were to be retained by the defendants as liquidated damages, and the agreement should thereby become null and void. The contract contained a provision that certain proceeds of the working of the mine should be deposited to the credit of the defendants and applied upon the payments thereafter to become due. There was also a provision that defendants were to continue in possession of the mine and continue to operate it, which was afterwards modified and possession was turned over to the plaintiff.

There is no question here as to the amount of the payments made by the plaintiff, and they will therefore not be set forth in detail. Suffice it to say that payments were made at the time named in the contract, or on such dates of extension as were agreed to by the parties. Further allegations of the bill were that the bills of sale of the property and the assignments of the leases, so placed in escrow in the bank, were never delivered to the plaintiff, but remained in the bank and that plaintiff refused to receive the delivery of said escrow papers on account of the fraudulent concealment practiced on and false representations and pretenses made to the plaintiff, which were by him discovered and verified soon after the date of making plaintiff's last payment to the defendants.

Then followed allegations as to the abandonment of certain shafts and that there were no hoisters or other means of getting below, and that the land had been theretofore mined and all the valuable ore had been mined out of certain tracts of land and the same filled with water; that the mining on a part of the ground had been done so that a drift was cut from one portion of the mine into the mined ground in the other, and the same had been drained of water through the grounds of the latter; that the defendants concealed from the miners doing the work that this cut there was a drift and connected the different portions of the mine, telling the workmen that such drift had been run to a drill hole, and was for the purpose of giving better air to the miners.

Plaintiff avers that, prior to the negotiations of the plaintiff for the purchase of said properties, defendants entered into a conspiracy with one Harley Cox, who was the ground boss in charge of the underground workings of said mine, whereby said Cox was to conceal the fact that said mining ground had been denuded of the valuable deposits of ore, and to present the said mining properties to purchasers as a valuable and attractive property to purchasers; that said mining properties were cut out and exhausted, as was well known by defendants; that plaintiff was induced to enter into the contract of purchase with the defendants by the fraudulent concealment and false and fraudulent statements and representations and false pretenses and frauds of the defendants and their co-conspirator, Harley Cox; that the defendants pretended to the plaintiff that the mined-over part of the land contained a large stope of rich ore, easily and cheaply mined, and that a large area of said land had not been mined at all, and was rich with ore running better than 3½ per cent., and to prevent the plaintiff from getting into said ground and discovering the fact that said ground did not contain any rich stope of ore but that said ground was cut out and exhausted, the defendants, by and through this ground boss, Harley Cox, caused the said drift connecting the mining excavations between the different portions of the mines to be filled up, and by means of shooting down the roof and sides of said drift made it appear as though there had never been any drift connecting such grounds, and thereby rendering it most inconvenient and practically impossible for the plaintiff's examiner to discover the true condition of the ground known as the Millard ground, and thereby inducing the plaintiff's examiner to rely on the pretenses and representations of defendants; that by said means it was concealed from the plaintiff, and plaintiff was prevented from discovering that said ground did not contain any stope of rich ore, but was entirely denuded of ore-bearing ground rich enough to mine at any profit; that in the said Millard ground there was a cave-in or falling of the roof into the excavation, which prevented mining a large part of the tract, and that defendants by the means aforesaid concealed said falling of the roof and prevented the plaintiff from discovering the same, as well as from discovering that the west side of said mine did not contain any stope at all that could be mined at a profit or otherwise; that all of the ore-bearing ground on that part of the land described in the contract as the Barnett Mining Company's lease had in fact been cut out, and defendants knew this fact, yet pretended that the same contained a rich stope, and fraudulently, in order to cheat and defraud the plaintiff, induced the plaintiff to enter into said contract and to make the payments above named; that the south part of the lands described in the leases (describing them) was entirely virgin or unmined land, except that a small area in the northwest corner had been cut over, and the defendants represented and pretended that they had drilled land adjacent to and west of said tract, and that the drilling showed rich ore-bearing ground, and that the ore body extended over on this area, and that a few drill holes had been put down on said tract, describing the location, which showed rich ore, and that said ground was rich in

ore; but plaintiff avers the facts to be that said drilling had indicated that all of said ground was barren of ore, that said tract had been thoroughly drilled, with the result that no ore had been discovered, all of which was well known to the defendants, but entirely unknown to the plaintiff, and said false pretenses, false claims, and fraudulent statements were made by the defendants in order to, and the same did in fact, deceive and mislead the plaintiff and his agent, and induced the plaintiff to enter into the contract of purchase and make the aforesaid payments thereunder.

Plaintiff avers that the defendants induced him to agree that defendants should remain in the possession of the property for which the plaintiff agreed to pay the defendants $175,000, and credit the net proceeds derived from mining operations thereon until all the payments set forth in the contract were made, in order to keep in the hands of the defendants the certain means of concealing the facts that the mines sold were cut out and exhausted mines; that the defendants assured the plaintiff that the ground would make a recovery of ore better than 3½ per cent.; that during the time the defendants operated the said mines pending the payments of the purchase money, they kept the aforesaid Harley Cox as ground boss and superintendent of the said mines; that in order to make it appear from the records of the mining that said mines were yielding a recovery of 3½ per cent., as falsely represented, the defendants caused large numbers of cans of dirt to be left off the count of cans hoisted, thereby making it appear that a smaller amount of dirt was run through the mill than was actually run through, and thereby making it appear that the dirt hoisted was richer in ore than it actually was, and thereby did in fact deceive and mislead the plaintiff, and did in fact fraudulently conceal from the plaintiff that the said mines were in fact cut out and exhausted mines, and by said frauds the plaintiff was in fact induced to make his payments to the defendants as herein stated; that plaintiff had in his employ a mining engineer, who owed the plaintiff the duty to make the most thorough and searching investigations from time to time, and to discover and report to the plaintiff the true status and conditions of the said mine, and to search out and discover any fraud that might be practiced on the plaintiff in the operation of said mine, and to discover and report to plaintiff any fact indicating that said mine was not as represented to the plaintiff at the time of the execution of the contract aforesaid; and the defendants knowing that plaintiff's said engineer sustained such fiduciary relation to the plaintiff, and with intent to prevent the discovery of the frauds being practiced on the plaintiff, and to prevent the full, free, and proper fulfillment of the performance of said engineer's duties to the plaintiff, from time to time during the period plaintiff was negotiating for said property and making the payments to defendants as herein averred, have paid money to the said engineer, but in what amounts the plaintiff is unable to state, but plaintiff states that the amount so paid was in excess of $2,000; that said payments to plaintiff's said mining engineer and employee were made secretly, and as soon as plaintiff had information indicating that said payments were made, plaintiff discharged his said employee;

that plaintiff would not have entered into this contract of purchase, had he known the defendants were secretly paying money to his said engineer, and that he would not have made the payments thereafter, or any part thereof, had he known such secret payments were being made to his said employee; that he notified the Joplin National Bank and the cashier thereof to return the escrow papers described in the contract, the leases and bills of sale, to the defendants, and notified the defendants of such action, and by the terms of the bill plaintiff offered to return to the defendants all that he received from them under the contract set out, pleading that he stood ready, willing, and was able to do and perform any obligation the court might by its order determine the plaintiff ought to do and perform, touching the matters therein, affecting the rights of the defendants. Plaintiff thereupon prayed judgment for $174,000, with interest from the date of the respective payments, and for such other and further relief as to the court might seem just.

The answer to the bill of complaint, passing over the formal allegations, admitted the ownership of the property in question on the 11th day of March, 1916; admitting that on that date the contract named in plaintiff's bill was entered into, that plaintiff made the various payments named in the bill; alleging that the defendants remained in possession of the property and made a profit of $16,000, which was credited on the contract as a part payment of the $175,000 by the plaintiff; admitted that the contract had never been delivered to the plaintiff, that it remained in the bank, and that plaintiff had refused to receive the delivery of the escrow papers.

Then follow allegations, in substance, that the defendants admit that this land had been mined by the defendants previous to the making of this contract, but denying that the valuable ore had been mined out of the tract, or that they knew of the fact, and then denying that all the valuable ores had been taken from the lands, alleging their good faith, and denying fraud, denying any agreement on their part, denying any conspiracy, and denying specifically the misrepresentations set forth in the bill of complaint. Defendants deny that any effort was made by them, or either of them, or any one representing them, to prevent the plaintiff or servants or agents from making a full and complete investigation of conditions of the property prior to the time the contract was entered into, deny any misrepresentation, deny any inducement set forth by the plaintiff, and deny that the possession of the property was retained by the defendants for the purpose of concealing the facts set forth in the bill of complaint, alleging that the same was held by the defendants for security for the payment of the amount named in the contract. They specifically deny that they caused a large number of cans of dirt to be left off the record in order to make it appear that a smaller amount of dirt was run through the mill, thereby making it appear that the dirt was actually richer than it was, deny that they had any knowledge with reference to whether or not the plaintiff had a mining engineer for the purpose alleged in the bill, and at the times alleged in the bill, deny that they paid or agreed to pay him any sum of money whatever, and deny that at the time of entering into the contract the valuable ores had been taken from said mine. Defendants

further aver that at the time the contract was entered into ore was selling at over $100 per ton, and that at such price said mine was a rich, valuable property, but that, after the defendants had delivered possession to the plaintiff, ore went down nearly $50 per ton; alleging further that at the time of said contract said defendants informed the plaintiff's agent that, if he took the mining property, he must take it upon his own examination, and if he was not satisfied with his own examination of the property not to enter into the contract, but that the plaintiff took the property after his own examination, and not by virtue of any fraudulent statement of the defendants or either of them.

Thereupon defendants, answering further, state that plaintiff cannot rescind the said contract to purchase for the reason that, after he had full knowledge of all the matters pleaded in the bill of complaint to the same extent he had such knowledge at the time of the filing of his petition herein, the plaintiff held and mined said premises, and pursued, carried out, ratified, and confirmed said contract and purchase, and speculated upon the relative advantage to him of so doing, or, on the other hand, of attempting to rescind said contract and purchase up to the day of filing his petition herein, and that plaintiff during said interval so acted and conducted himself with such knowledge and information as to confirm said purchase and deprive himself of any right to rescind he might have had.

There is then set forth the provisions of the contract, the times of payment, the extension of the time on different payments, etc.; that he failed to mine the premises and work them in a minerlike manner, and failed to properly timber or otherwise support the ground, or to leave pillars for that purpose, and had cut the underground workings in such a manner as to weaken and impair the ground and injure and destroy the same for the purpose of mining; that plaintiff removed certain portions of the machinery and equipment therein set forth, and that certain powder used by the plaintiff under a contract originally made by the defendants was charged to the defendants, the plaintiff thereby securing the benefit of a reduced price; that the plaintiff by his laches had not only lost any right of rescission he might have had, but that he fully ratified and confirmed said contract and purchase, and by a later contract of May 24th modified the original contract of purchase and extended the time of payment, and that of August 24th, withholding a part of the balance due August 20, 1916, and by the various other matters and things complained of therein plaintiff ratified and confirmed the said contract and purchase, and waived any rights or claims he might ever have had on account of the matters complained of in his petition; that plaintiff never expressed to defendants any dissatisfaction with the said contract of purchase, or demanded any rescission thereof until the filing of this suit. Defendants pray judgment in their favor, that they go hence without day, and for costs.

Barring the specifications of error relied upon by defendants which are clearly eliminated by Barnett v. Conklin, supra, there remain but four specifications of error:

(1) The court erred in holding that there was any proof upon which to base a finding that the defendants had paid or agreed to pay the agent of the plaintiff any sum of money for a favorable report on the mine sold to the plaintiff by the contract referred to in the pleadings and decree.

(2) The court erred in holding that there was sufficient proof upon which to base a finding that the defendants had paid or agreed to pay the agent of the plaintiff any sum of money for a favorable report on the mine sold to plaintiff by the contract referred to in the pleadings and decree.

(3) The court erred in holding that the plaintiff by his conduct had not waived the right to rescind the contract described in the pleadings and decree of the court.

(4) The court erred, in view of the undisputed evidence in the case that the plaintiff after he became possessed of the knowledge upon which he bases his right to rescind the contract proceeded to use the property as his own and damaged and disposed of the same while so using it to the amount of more than $7,000 and thereby making it impossible to return the property to defendants, in holding that such conduct did not preclude a rescission by plaintiff.

[1] Nos. 1 and 2 set forth above may be considered together. The chancellor heard the witnesses, observed their demeanor upon the stand, and after full argument and thorough consideration duly filed memorandum opinion on final hearing, and thereby held that there was sufficient evidence to sustain the various charges of misrepresentation and fraud alleged in the bill. It is the settled law of the federal courts that, where a chancellor has made his findings of fact and decree on conflicting evidence, they will be treated as presumptively correct by an appellate court, and will not be disturbed, unless an obvious error has intervened in the application of the law, or some serious mistake has been made in the consideration of the evidence. Blank v. Aronson, 187 Fed. 241, 109 C. C. A. 327; Thallmann v. Thomas, 111 Fed. 277, 49 C. C. A. 317.

[2] Taking the entire record, together with the reasonable inferences to be drawn therefrom, we are impressed with the correctness of his findings. The entire situation, as it is revealed by the record is: Ground, the father-in-law of Barnett, both of them experienced miners and having expert knowledge and actual experience with the properties in question; the plaintiff, a business man in New York; the attention of the plaintiff brought to other mines in that vicinity with a purpose of investment; an arrangement made with a friend of his on the ground, one Briegel. We find the defendant Ground, father-in-law of Barnett, in Texas, and Barnett sends for him; he arrives there in March, and at once there is a conference with Barnett, and Ground undertakes the task of purchasing the one-fifth interest held by Barnett's nephew, J. J. Barnett, and the first interview with him occurred just a few days prior to the time the sale to this plaintiff was consummated.

Ground's representations to J. J. Barnett, in his attempt to purchase the latter's interest in the mine, were, in substance, that the mine was

271 F.—37

worked out; that it was practically worthless. He exhibited a blue-print map that had been prepared, probably not for this purpose, probably true, showing the ore workings, and that the ore was largely exhausted. These statements differed materially from those testified to that were made immediately thereafter to plaintiff's agent Briegel by the defendants Barnett and Cox. As to evidence of statements of Barnett and Cox, it is sufficient to say that it clearly supports the allegations of the bill.

The purchase of this interest of the nephew Barnett is, in a way, connected with the sale to this plaintiff. Defendant Ground denied to him that there were any negotiations for a sale of the property pending, except one involving a trade for some lands in Oklahoma. That was false; the sale of the property to this plaintiff was pending. Ground was not only attempting to, but he actually did, defraud J. J. Barnett by the purchase of his one-fifth interest in this property, for the purpose of transferring the whole of it to the plaintiff for the sum of $175,000 making his share in the property at that figure worth $35,000, while, through the false representations of Ground, J. J. Barnett parted with this interest in this property for $9,350. Ground denies that he told Barnett that the ground was cut out; denies making the statement that there was no deal pending. However, it conclusively appears by the testimony of numerous witnesses: Judge Scott, the attorney for the plaintiff; Briegel, his agent; Barnett—all corroborate the testimony of the plaintiff that the details of the contract and purchase were being formulated at the very time that Ground made this purchase of J. J. Barnett, and it occurred, as a matter of fact, between the date of the telegram from the plaintiff to his agent Briegel authorizing him to make the purchase, and the date of the making of the contract referred to in the bill. If that was not true, and if Ground acted fairly and conscientiously with J. J. Barnett, the owner of a one-fifth interest in the property, then that fact conclusively shows the misrepresentations to the plaintiff, because the blueprint of the ground, exhibited to J. J. Barnett by Ground, showing the mine practically worked out, is inconsistent with the admitted statements of the defendants to the plaintiff and his agent; and the statement that the mine was cut out is inconsistent with the representations as to the great value of the mine, made by the defendants to the agents of the plaintiff. This representation as to the mine being worked out and of little value, and that no sale was contemplated or was in process, was testified to by J. J. Barnett, who has no interest in the result of this action and is not a party to it. Ground was an active participant in getting this title, and getting it for the purpose of transfer to this plaintiff.

It is admitted that the plaintiff, when he determined to look over this and other mines in that vicinity, with the thought of investing in them, employed Burch, deputy state mine inspector, upon assurances by Burch that he could get at the facts with reference to this and other property, and the plaintiff, relying upon his statements that he could and would secure the facts, and report to him the conditions as they actually existed, employed him, giving him $100 per week, and

then and there made up a form of report that should be made upon this and other properties that the plaintiff wanted investigated. The record discloses that Burch thereafter, in pursuance of that employment by the plaintiff, did make report to the plaintiff, and it is disclosed that the report he made was not from an investigation, and was not a statement of what he knew to be the fact with reference to these mines in the particulars affecting the representations (important here), but they were the statements made to him by the defendants; the defendants knowing that he was the paid agent of the plaintiff.

The manner of the payment of money to Burch by the defendants shows the character of the men involved. Burch, just a day or two succeeding the date of the sale, meets the defendant Barnett in the bank, the latter draws $500 in cash, he and Burch go to the basement, and in the toilet Burch is handed the $500. A month later $2,000 more is paid to Burch, and what is the explanation given? Barnett admits the payment of these sums; Burch says that the money was paid by Barnett purely as a present. It may be noted that Burch made contradictory statements upon the witness stand, and in the light of his testimony alone a fair inference supports the conclusion that it was a bribe paid by the defendants for the misrepresentations he made to this plaintiff to induce the plaintiff to make this purchase. Another phase of the testimony would indicate that the defendants intended to convey the impression that they were paying this money to plaintiff's agent on the theory of a commission yet to be earned by Burch in the sale of another property. Burch, however, admitted that this deal did not go through, and the commission was never earned, and that so far as he knew Barnett was still holding him liable for the $2,500 paid, although he had never mentioned the matter of reimbursing him, and had never made any demand upon him. This explanation does not explain. If the defendants had remained silent with reference to this, the purpose of it could have been no more certain.

Among other statements made by the defendant Barnett is an admission that he entered into a scheme and combination with the other defendants to defraud Conklin, by arranging to pay Conklin's agents, Briegel and this mine inspector, Burch, a commission of $20,000, if they would make favorable reports and recommend to Conklin the purchase of Barnett mine No. 2, for $200,000. This is with reference to another mine, and is a matter that was pending at the same time, and conclusively shows the knowledge on the part of the defendants of the relation that Burch sustained to the plaintiff.

In the light of this and other testimony in the record, the chancellor was clearly justified in his finding that "the explanations made by defendants and by Burch are totally unsatisfactory and are not credited." That Burch did make false representations to Conklin cannot be controverted. The testimony of the plaintiff is that the written reports made by Burch upon this property were entirely false as to all matters concerning the character and quality of the mine, the richness and recovery of the ore, and the profits derived from its operation. The written statement of Burch, the agent, "This mine is worth two McDonalds," was false, and was known by him to

be false. This report of Burch covering this property gave much information, went into many details, and was furnished pursuant to an agreement with the plaintiff in which the agent, Burch, himself testified that he agreed with the plaintiff to get statistics for him, and that he worked for three weeks during February and early March, and was paid $100 a week, identifying the checks given him in payment for these services. He also identified the reports that he made covering the mines.

It cannot reasonably be said that upon this entire record there is no substantial testimony of a conspiracy on the part of these defendants and Burch to defraud this plaintiff in the sale of this property. That the representations alleged by the plaintiff in his bill were actually made is supported by the testimony of the agents of the plaintiff. That the reports were made by Burch as the agent of the plaintiff is not denied. That Burch, in collaborating with the defendants, furnished the plaintiff just the report that was given to him by the defendants, we think, is reasonably sustained by the record. That these reports were false sufficiently appears. That the plaintiff relied upon them there is nothing to dispute. He testifies that he knew nothing of mining properties, that he informed these people to that effect, that he employed this man Burch for the very purpose of getting expert information upon the character of the mine and the ore, the quantity, etc., and that he did rely upon those reports and that they were false.

The record reasonably sustains the finding that this purchase by this plaintiff was induced by these misrepresentations, and that the defendants agreed to pay Burch a commission for his favorable recommendation of the mining property in question, and that they did pay him $2,500 for that service. It is just as clear that these representations were not only fraudulent, but that they were made with the intent and purpose charged in the bill of complaint. From this kind of testimony, and in the light of many other incontrovertible facts which we have not taken time to set forth here, we have no difficulty in finding that these defendants made the representations ascribed to them by the plaintiff and in the sense alleged by the plaintiff. As said in a recent case in this court:

"It would be a reproach to the law if the rule determinative of the rights of the parties upon the foregoing facts were uncertain. Fortunately the situations are few in which one party to a business transaction can deliberately lie to the other with legal impunity." Walker v. Pike County Land Co., 139 Fed. 609, 71 C. C. A. 593.

Burch, as the agent of the plaintiff, stood in a fiduciary relationship to him and was bound to the utmost good faith in his dealings with Conklin. The fact that the defendants entered into an arrangement with him, whereby they bribed him, knowing him to be the agent of the plaintiff, to make a favorable report of this mine, and subsequently paid him the commission agreed upon, would, in itself, be a sufficient ground for the rescission of this contract.

It is contended by the defendants that plaintiff had an opportunity of inspecting the property in question, and that if he did not exercise

that right that it is his own fault. This contention overlooks the facts: First, that the means of knowledge as to the condition of the property were not equally open to the plaintiff and the defendants; and, second, that the plaintiff was in the state of New York, and that the defendants, knowing that plaintiff relied upon his agent, bribed and corrupted him to make this favorable report on the property, with the intent that it should be relied upon by plaintiff, to the end that it might induce him to pay a sum largely in excess of its value.

We are of the opinion that the record clearly sustains the findings of the chancellor, and that the said specifications of error, numbered 1 and 2 herein, are not well taken, and must be denied.

[3, 4] The next two specifications of error relied upon by defendants involve the right to rescind this contract under the circumstances above set forth and the alleged laches and waiver on the part of plaintiff.

"The glaring fraud perpetrated on the appellant gave him the right, the moment he discovered it, to rescind this purchase. There was, however, no obligation upon him to exercise that right. He had the option to reconvey the land, and recover his purchase money, or to retain the property and affirm the contract. Justly and wisely the law gives him his choice, but at the same time it imposes on him the duty of making his election speedily. It not only imposes this duty, but it compels its performance. If he elects to rescind, it demands that he shall return the property he has obtained, and give notice of his election promptly upon the discovery of the fraud, to the end that the parties may be placed in statu quo. * * * If the fraud is discovered while the value of the property remains substantially as it was when the sale was made, a rescission of the contract then is just and equitable." Scheftel v. Hays, 58 Fed. 457, 459, 7 C. C. A. 308, 310.

Upon the foregoing statement it seems clear that plaintiff was entitled to rescind this contract and to recover the amount paid for this property, unless he has waived his right to rescind, has ratified the contract, or is guilty of laches, and is equitably estopped to assert his right to rescind, all of which must be determined in the light of the facts, supported by substantial evidence in the record. A brief résumé of the facts appearing in the record, material to the determination of this issue, is:

Plaintiff, in New York, secured his information that his agent, Burch, had been bribed, through a letter written by his attorney, Judge Scott, at Joplin, Mo., dated June 26, 1916, in which he wrote:

"I have just learned from Mr. George H. Playter a very startling piece of news, which alarms me very much, in reference to the Roland mine. Mr. Playter told me that Dr. Barnett told him that he had been compelled to pay to Lee Burch the sum of $10,000 in the matter of the purchase of the Barnett property. He said there was no question but that Briegel got half of it, as Burch and Briegel were dividing everything that Burch obtained on a fifty-fifty basis. This was startling news to me. If I were you, I would say nothing about this to Briegel or any one else until I came here and had a talk with Mr. Playter and Dr. Barnett. I have concluded not to say anything to Dr. Barnett about it until you arrived. I thought of telegraphing you this information as soon as I got it, but after thinking it over concluded it would be better to write you about it."

Thereafter, on June 29th, Scott wired to plaintiff at New York, and followed it with another letter, in which letter Scott says:

."I asked Mr. Ground if that was true. He stated that the amount was incorrect. He said that without his knowledge or consent Dr. Barnett had paid to Mr. Burch the sum of $2,500 commission on the sale of the Barnett mine, one-half of which was understood to be for Briegel, and Mr. Ground stated that as soon as he learned that the money had been paid he protested very strongly against it to Dr. Barnett, his son-in-law, and refused to be involved in the transaction. I told him that I intended to give you the information immediately. I therefore wired you the message which I now confirm, as follows: 'Just learned correct amount paid Burch Barnett twenty five hundred. Confidential communication.' Mr. Ground said that, if I gave you this information, it must be a confidential communication, and that it must not be known that the information came from him. He requested me very earnestly not to tell you the source of my information, as it might make trouble between himself and his son-in-law. I told him that you were my client, and that the communication would be one between attorney and client, and therefore confidential. I assured him that you would never in any way involve him in the matter, 'or let any one know that he had been kind enough to give us the information. I felt that, regardless of his request, it was my duty to disclose to you the source of the information and all available facts. Under the circumstances, I think you should keep this matter as quiet as possible, and when you come out here we can go into it fully, and decide what, if any, action should be taken."

The plaintiff was in New York, and the record does not disclose that he believed this statement. He made his arrangements to go to Joplin as soon as he could conveniently, arriving there in August. He at once had a short talk with the defendant Barnett, and evidently followed the advice of his counsel, and did not mention the matter of the bribe to Barnett, but went to Kansas City and had a talk with Ground, in which he asked Ground if a commission had been paid to Burch, and Ground assured him that there was nothing to the report. Here the record discloses that at this time the defendants were pressing plaintiff for the last payment on this property, and it further appears by the terms of the contract that, if he failed to pay, he forfeited to the defendants, as liquidated damages, all that he had paid on the contract of purchase. Observing that this information, which came through Judge Scott was that one Playter had said that Barnett told him that Burch had been paid $10,000, then came the information through the same source, through Scott, that Ground had said that $2,500 only was paid. The record does not disclose that plaintiff believed this report at this time. He was simply put upon inquiry, and it would seem that he exercised reasonable diligence, using the means of knowledge which were at his command to discover the truth with reference to the alleged fraud.

The mere statement of this report to him by a third party would not justify him in rushing to a rescission and thus incurring the forfeiture named in his contract. Even if, when he received these letters and reached Joplin, he had believed the charges, this information which had come to him would not necessarily evidence that he had knowledge of facts which would justify the charge or support a demand for rescission. There is a distinction between his belief and his conviction that the evidence he commanded or was able to command would connect the defendants with the fraud. A mere rumor or suspicion does not require an election. Information of that character puts one upon inquiry and requires the exercise of that reasonable diligence which

a man of ordinary prudence would and should use to ascertain the facts and the evidence necessary to sustain a charge that an advantage had been obtained by reason of the unfair and fraudulent transactions on the part of the defendants. The record discloses that in a fair, open way, the plaintiff went to the defendant Ground himself, and Ground assured him that Scott had made a mistake and that there was nothing to the charge. The plaintiff, therefore, had no evidence of wrongdoing and accordingly protected his interest in the contract and returned to his business, but immediately upon his return received the letter from Briegel, dated August 23, 1916, which letter shows that he had left with his agent, Briegel, the duty to try to get some evidence of the fraudulent transactions, if any there was, which letter, among other things, stated:

"Joplin, Mo., August 23, 1916.

"Mr. Roland R. Conklin, 1 Wall Street, New York City—My Dear Mr. Conklin: Prior to the time that you left Joplin, when the Burch matter came up, I told you that if it were possible, after an understanding had been arrived at with Barnett regarding the powder situation, that I was going to thresh the matter out and ascertain the details. When I received your letter of Sunday the 13th from Kansas City, in which you told me that you had talked with Mr. Ground and had verified the suspicions that you had in that connection, I felt that the only way to handle the matter was to simply take the bull by the horns, which I did.

"I called Burch into the office and advised him that after the 1st of the month his services would no longer be required by the corporation. He most naturally was very anxious to know the reason and asked whether or not he had not made good. I could not help but tell him that in my opinion his work had been satisfactory, but I added, however, to avoid trouble, that it was your idea to economize at every possible point, and that you deemed it advisable to secure the services of a man who was capable of handling Von Borries' work as well as the work he (Burch) was doing, and that you felt that his experience would not warrant the responsibility being left to him, inasmuch as the future carried some difficult problems. * * *

"I told him that it had come to you that he had accepted $2,500 from Dr. Barnett to make a favorable report on that property prior to the time we purchased it, and that Barnett had explained that it was necessary that he be paid that amount in order for the deal to be made.

"I told him that you had no desire to do he nor anybody else an injustice, but when this was brought to your attention you felt that it deserved some investigation, and that you had satisfied yourself through parties concerned as to the truth of it. I told him that in the face of these things that he must realize that you could not have any confidence in him. He listened patiently to these accusations, and then denied them and insisted that he be given an opportunity of proving the truth. This, of course, I could not deny him, and I am submitting to you the situation exactly as it was presented to me. * * *

"Burch has retained Spencer & Grayson, and intends suing Scott for damages, and, from what I can learn, they don't seem to think there will be any doubt but what they will get a judgment against Scott, and they contend that, if it were known that Scott accepted a commission from the seller at the time he was acting as our attorney, that it would disbar him.

"I can't for the life of me understand it. Barnett and Ground are admittedly in a tight hole. They have either insinuated a lie to you, or else they have deliberately lied to me, and if it is true that Burch did accept this money to make a favorable report on the property, I can only say that I am very, very sadly disappointed in him. If, on the other hand, it was accepted as they represent, it is another matter. Two sides of the story, however, have been heard, without ever having made any effort at investigation, and I am afraid that I must call upon you to act as judge. * * *

"Yours faithfully,                                              Jess Briegel."

It will therefore be seen, on August 23d, the agent of the plaintiff on the ground at Joplin still believed in the honesty of the parties concerned. There was no evidence of wrongdoing. There was no testimony to support the charge. It ought not to be seriously contended that plaintiff should have determined then and there that he had discovered the fraud, and that he had evidence of such fraud that would justify him in taking the chances of forfeiture set forth in the contract, without further inquiry. He as yet had but suspicion, a statement of some one that some one else told him that his agent had received a commission. He must also have the proof that his agent had a prearrangement with the seller under which he received the commission, but there was no hint of proof or evidence to sustain that essential element. Further, the record discloses that when this communication came in June to him in New York, both of his agents at the location of the property were placed under suspicion, and he had no one to rely upon except his attorney, who, the record discloses, advised him to keep the matter secret until they could make further investigation and get some evidence to sustain the suspicion. His attorney evidently acted upon the thought that one who would go into an arrangement of that kind would use every effort to avoid giving up the evidence of it, realizing that it would be necessary, if he would rescind the contract, to get hold of facts that would sustain the charge and therefore justify an action for rescission, and that he could not advise rescission until he could pursue the investigation and get the evidence. Mr. Conklin's suspicions were aroused. He pursued the investigation through his agent at Joplin, and immediately upon having the data, the facts presented in evidence in this case, commenced his suit to rescind on the 18th of October, 1916.

Until knowledge of this fraudulent transaction or knowledge of facts equivalent thereto were brought home to this plaintiff, there could be no laches in his failure to rescind and prosecute this suit. These suspicions which he entertained were not knowledge, they were not facts, and the record discloses that he pursued the information arousing his suspicion diligently, and, immediately upon securing the facts and knowledge introduced in support of his charges, made his rescission and commenced his action. A consideration of this situation, as thus developed in the record, not only shows diligence on the part of the plaintiff in the pursuit of his inquiry, but there is an entire absence of facts upon which a ratification can reasonably be predicated, after he discovered the fraud.

"To constitute laches as a bar to relief in equity, something more than mere lapse of time is necessary. There must be some change of circumstances from the time the suit might have been brought rendering it inequitable to grant the relief sought. Where the defendant has not been prejudiced, and there is a reasonable excuse for the delay, the suit is not barred." Central R. Co. of N. J. v. Jersey City (D. C.) 199 Fed. 245.

"Laches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced." Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738.

"The doctrine of laches rests upon equitable principles which are neither arbitrary nor technical, and what amounts to laches depends largely upon the circumstances of each particular case. The ultimate inquiry is on which

side would fall the balance of justice in sustaining or denying the defense. The important elements to be considered are the length of time which has elapsed, the nature of the acts which have been done in the meanwhile, the knowledge which the complainant had of the fraud which he charges, and the time when he acquired that knowledge and the change in the situation during neglectful repose, either as to the loss of evidence which would have been available to the defendant or the advance in value of the property which may be the subject of the suit." Northern Pac. Ry. Co. v. Boyd, 177 Fed. 804, 823, 101 C. C. A. 18, 37.

Applying the rule above stated, the chancellor who tried this case found no difficulty in determining on which side would fall the balance of justice, and denied the defense of these defendants. The length of time that elapsed, from the time of the first suspicion in June to the date of the commencement of this action in October, considering the uncertainty of the information and the difficulty of arriving at the truth, and that the plaintiff went directly to the defendants at the very first opportunity, going the long distance from New York City to Joplin for the purpose, and that they denied that there was anything to it, and considering that thereafter the inquiry was pursued with such diligence that by the date of the commencement of the action in October he had secured the testimony that was introduced in support of his claim in this case, it cannot be said to be an extreme length of time. The chancellor was clearly justified in holding that the plaintiff had used reasonable diligence under the circumstances. This, too, must be determined in the light of the fact that the record discloses that in the meantime, from the date of the first suspicion in June until the rescission of the contract and the commencement of the action, there had been no change whatever in the situation, either as to the loss of evidence which would have been available to the defendants, or otherwise. It has been held that:

"If * * * it clearly appears that lapse of time has not in fact changed the conditions and relative positions of the parties, and that they are not materially impaired, and there are peculiar circumstances entitled to consideration as excusing the delay, the court will not deny the appropriate relief, although a strict and unqualified application of the rule of limitations would seem to require it. Every case is governed chiefly by its own circumstances." Wilson v. Wilson, 41 Or. 459, 69 Pac. 923.

This court has held:

"Equitable estoppel is the indispensable foundation of such laches, acquiescence, or ratification as will bar a suit. Knowledge on the part of the person to be estopped, or such notice as would lead the ordinarily diligent to knowledge of the material facts that would ordinarily cause action, ignorance of those facts by the party claiming the estoppel, and silence and inaction for an unreasonably long time by the party to be estopped, causing the party claiming the estoppel to take such a position in reliance thereon that injury to him will result from delayed action to avoid, are essential elements of such an estoppel, or of such laches, acquiescence, or ratification by silence and inaction as is here claimed." Elder v. Western Mining Co., 237 Fed. 966, 976, 150 C. C. A. 616, 626.

For the reasons heretofore suggested, the undisputed facts in this case fail to support any of these essential elements, and the chancellor committed no error in his findings and judgment in favor of the plaintiff and against the defendants.

The decree of the District Court is affirmed.

STONE, Circuit Judge (dissenting). I am compelled to dissent because the evidence is, to my mind, conclusive that Conklin waived all right to rescind the contract by his delay and actions after he knew the facts upon which he later predicated this action to rescind. This evidence shows that plaintiff was put upon investigation of this bribery transaction late in June, and followed the matter up through Briegel until he came out to Joplin, in the first half of August; that while in Joplin he investigated further and became convinced, and September 1st discharged Burch, partially on account thereof; that a payment of $20,000 was due July 20th, but shortly before that date plaintiff requested and received an extension until July 27th, when one-half the payment was made, and an extension for the other half obtained to August 8th, when it was paid; that the final payment, $20,000 due August 20th, was extended, at his request, to September 5th, when it was paid, except a small sum held back at his request to enable him to take advantage of certain powder contracts; that plaintiff continued to work the mine during some of September, and again in November and December; that portions of the machinery at the mine were removed during September to other property of plaintiff; that the lease to defendants was forfeited, because of plaintiff's failure to work.

We thus find the plaintiff, after knowledge of the facts upon which he now relies for rescission, recognizing the contract as in force by obtaining extensions of payments, making those payments, continuing to operate the property, and finally, through failure to operate, for reasons not connected with defendants' actions, losing to defendants, as well as to himself, the lease they held from the owner. This certainly constitutes an election to consider the contract as binding, and is a renunciation of any rights of rescission.

I think that the case should be reversed.